**In re Robert R. STONE, Jr., Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. 95–BG–1519.**

District of Columbia Court of Appeals.

Dec. 18, 1995.

Before TERRY and RUIZ, Associate Judges, and PRYOR, Senior Judge.

### ORDER

PER CURIAM.

On consideration of the report and recommendation of the Board on Professional Responsibility, recommending that the respondent be suspended for thirty days, the letter from Bar Counsel electing not to note an exception to the report and recommendation of the Board on Professional Responsibility, the letter from respondent electing not to note an exception to the report and recommendation of the Board on Professional Responsibility and requesting *nunc pro tunc* treatment of the Board on Professional Responsibility's recommended sanction, and Bar Counsel's opposition to the request for *nunc pro tunc* treatment, it is

ORDERED that respondent's request for *nunc pro tunc* treatment of the Board on Professional Responsibility's recommended sanction is denied. It is

FURTHER ORDERED, pursuant to Rule XI, §§ 9(g)(2) and 11(f)(1) of the Rules Governing the Bar, that the recommendation of the Board on Professional Responsibility is hereby adopted, and respondent shall be suspended from the practice of law in the District of Columbia for thirty days. It is

FURTHER ORDERED that respondent's suspension shall take effect thirty days from the date of this order. *See* Rule XI, § 14(f). It is

FURTHER ORDERED that respondent's attention is drawn to the requirement of Rule XI, § 14, relating to suspended attorneys, and to the provisions of § 16(c) dealing with the timing of eligibility for reinstatement as related to compliance with § 14, including the filing of the required affidavit.

### APPENDIX

DISTRICT OF COLUMBIA COURT
OF APPEALS BOARD ON
PROFESSIONAL RESPONSIBILITY

IN THE MATTER OF: S., RESPONDENT

Bar Docket Nos. 42–85, 230–895, 235–86

REPORT AND RECOMMENDATION OF
THE BOARD ON PROFESSIONAL
RESPONSIBILITY

This matter is before the Board on Professional Responsibility following a report of Hearing Committee Number Four. Respondent has been charged with disciplinary vio-

lations in two separate proceedings, and a third disability proceeding has been brought against him. In the first matter, the hearing committee recommended a public censure. In the second, the hearing committee recommended a thirty-day suspension. In the third matter, the disability proceeding, the hearing committee found that Respondent suffered from alcoholism, and it recommended a five-year and thirty-day suspension, with all but thirty days stayed and with Respondent being placed on probation. After passage of several years, the Court of Appeals ruled that the three proceedings should be considered together and it remanded them. Several more years passed before Hearing Committee Number Four found no disability and recommended a thirty-day suspension as a sanction for the two disciplinary violations.

### PROCEDURAL HISTORY

1. *The First Disciplinary Case*

In an order dated November 2, 1983, Respondent was suspended for three years by the Virginia State Disciplinary Board. Respondent did not report this discipline promptly to the District of Columbia Court of Appeals. When he did report it, in 1985, the court referred the matter to the Board on Professional Responsibility for consideration of reciprocal discipline. The Board determined that reciprocal discipline was not appropriate and that it should proceed *de novo*. Some of the acts charged in Virginia did not constitute misconduct in this jurisdiction, and some of the misconduct established in Virginia may have warranted substantially different discipline in the District of Columbia. By order dated May 29, 1985, the Board referred the matter to a hearing committee. A hearing was held on October 1, 1985.

The Virginia proceedings arose out of Respondent's retention by the parents of Steven Javage in June 1981 to represent their son in a criminal matter. Respondent charged and was paid a $1,000 retainer for his profession-

al services and a $90 advance to pay for a transcript of a preliminary hearing. In August 1981, the Javages discharged Respondent. Because they had paid for the transcript themselves, they asked for the return of the $90. Respondent refused to return the money. When the Javages filed a disciplinary complaint against Respondent in Virginia, Respondent sent Mrs. Javage a check for $90 that was returned for insufficient funds. A second check was subsequently paid. Respondent testified that the files of the Javage case had been lost after being placed in storage and that his attorneys in the Virginia matter had failed to return financial records relating to the Javages. Respondent was unable to produce any accounting at his District of Columbia hearing.

The Hearing Committee found that Respondent had violated DR 9–103(B)(3), failing to maintain complete records of all funds paid to him, and DR 9–103(B)(4), failing to pay promptly to the Javages the $90. The Hearing Committee recommended a public censure by the court.

In a report dated May 12, 1986, the Board agreed with the recommendations of the Hearing Committee and recommended that the court enter an order publicly censuring Respondent. In its Report, the Board noted that Bar Counsel had sought a more severe sanction because of evidence of alcoholism. In responding to this argument, the Board took the first step down what was to prove a disastrous procedural course by agreeing with the Hearing Committee that Bar Counsel's challenge to Respondent's present fitness to practice law was not relevant to the charges of past violations of disciplinary rules. The Board erroneously noted that "where the Respondent does not himself raise the issue of alcoholism by way of mitigation, the proper manner for Bar Counsel to proceed with respect to this issue, if in his discretion he chooses to, if by way of the Court's established procedure [for disabled lawyers]." (Board Report I at 7.) [1]

---

1. The Board has issued three previous reports, "I" in connection with the reciprocal disciplinary matter, "II" in connection with the original disciplinary matter, and "III" in connection with

the disability matter. The Board has also issued a lengthy order in 1993 in connection with a motion to dismiss the disability proceeding.

### 2. The Second Disciplinary Case

While this first matter was under consideration, a second, original jurisdiction matter was petitioned in the District of Columbia. Bar Counsel initiated a petition charging Respondent with various violations, which resulted in an evidentiary hearing on February 12, 1986.

The factual allegations underlying this second disciplinary matter were as follows: Respondent was suspended on November 30, 1983, for non-payment of D.C. Bar dues. In the spring of 1984, after he had been suspended by the Commonwealth of Virginia, he moved his practice to the District of Columbia. In November 1984, Respondent made an inquiry and learned that he had been suspended for failing to pay his D.C. Bar dues. Nevertheless, he continued to practice during his suspension. He was not reinstated until December 1985.

In April of 1984, Respondent replaced another lawyer representing Erhan Dincer in a civil action filed in Superior Court. His predecessor gave Respondent his file in the *Dincer* matter. Respondent and Mr. Dincer were unable to agree on Respondent's fee in the case. Nevertheless, in June of 1984, Respondent filed pleadings on behalf of Mr. Dincer, thereby entering his appearance in the Superior Court matter. Mr. Dincer, who was dissatisfied with Respondent's fee arrangement, demanded the return of some monies that he had advanced to Respondent and that Respondent discontinue work on this case. Respondent refused to return the file after several promises to do so. Ultimately, the file was lost when Respondent failed to pay the storage fee for the facility where the file was in storage. In May 1985, Respondent appeared at a pre-trial conference. Mr. Dincer reiterated his position that he had discharged Respondent, and demanded that the file be returned. Ultimately, the case was settled in 1986, and it appeared that Mr. Dincer was not prejudiced by the loss of his file.

Based on these facts, the Hearing Committee found, and the Board agreed, that Respondent had violated DR 3–101(B), practicing after suspension for non-payment of his Bar dues, and DR 9–103(B)(4), failure to deliver upon client's request property that the client is entitled to receive. The Hearing Committee had recommended a public censure. Bar Counsel argued for an increased sanction because Respondent was an alcoholic and unfit to practice law, and because Respondent had been recommended for another public censure in the first disciplinary matter. Consistent with its position in the first matter, the Board erroneously agreed with the Hearing Committee that where the Respondent had not raised alcoholism in mitigation, it was not appropriate to consider it in the disciplinary proceeding. The Board did agree, however, because of the presence of prior discipline, that the sanction should be enhanced, and it recommended that Respondent be suspended for thirty days.

### 3. The Disability Proceeding

Concerned about evidence of alcoholism and its effect on Respondent's ability to practice, and in light of the refusal of the hearing committees and the Board to consider alcoholism in the absence of it being raised either in defense or mitigation, Bar Counsel initiated a third proceeding, pursuant to then-Section 16(3) of Rule XI, to determine whether Respondent was incapacitated from continuing to practice law. A hearing committee heard what the Board characterized as "comprehensive" evidence, including reports of two medical experts, that Respondent was an alcoholic who was incapacitated from practicing law whenever he was drinking. The committee recommended that Respondent be suspended for five years and thirty days, and that after actual suspension for thirty days, the remainder of the suspension be stayed and Respondent placed on probation. The Board agreed that the Hearing Committee's findings of fact were supported by clear and convincing evidence, but interpreted Section 16(3) of Rule XI to require an order suspending Respondent for an indefinite period because of his incapacity and to require that Respondent remain suspended until he could produce evidence of rehabilitation. The Board further recommended that the other two disciplinary matters, which had not yet

been decided by the court, be held in abeyance during the time of the suspension.

Part of the evidentiary record on which the Hearing Committee and the Board relied in recommending that Respondent be suspended was testimony that Respondent was a "third-stage" alcoholic and that he had impaired neuropsychological functions and organic brain dysfunction as a result of alcohol abuse. Evidence established that Respondent's alcoholism had a substantial adverse effect on his ability to practice law. Respondent himself acknowledged that his ability to represent clients had been diminished by alcohol abuse and that he had not been fully successful in handling the problem. There was also evidence in the record that while Respondent had entered the Lawyer Counseling Program and a residential therapeutic community for alcoholics, he had failed to honor his agreement with the Lawyer Counseling Program and had been evicted from the residential program. It was important to the Board's recommendation that Respondent had a history of failure to adhere to recovery programs and that his alcoholism appeared to have been one of the causes of his misconduct. Finally, the Board recommended that the court act on its report and recommendation on an expedited basis. The Board's Report in the disability proceeding was issued on June 14, 1988.

### 4. The Court of Appeals Decision

In an opinion issued on July 27, 1990, the court took up the three proceedings. The first two cases had been held in abeyance, awaiting the outcome of the disability proceeding. In its opinion, the court rejected the position of the Board that the issue of Respondent's alcoholism should be considered in a separate proceeding if not raised by the Respondent in mitigation. The court noted that the issue of incapacity was incapacity to practice law, and it concluded that it made more sense to consider the issue of alcoholism in the context of the disciplinary proceedings in order to shed light on that crucial issue. Accordingly, the court remanded all the proceedings for further inqui-

ry into the question of Respondent's present capacity to practice law, both in relation to the misconduct involved in the disciplinary proceedings and as may have been manifested subsequently by available evidence.

### 5. The Proceedings on Remand

At the time that the court issued its opinion, these proceedings were already five years old. Another five years was to pass before the matter came back before the Board for oral argument. Upon receipt of the court's opinion, the Board remanded the matter to a Hearing Committee. At a prehearing conference on November 13, 1990, Bar Counsel sought to obtain the agreement of Respondent that he submit to neuropsychiatric testing so that the report of the expert who had testified almost three years before could be updated. (Tr. I at 10.)[2] Respondent refused to agree. (Tr. I at 11.) The hearing was set for December 5.

Respondent's refusal to agree to further neuropsychiatric testing resulted in a motion to the Board seeking authority to file a petition with the court requiring Respondent to submit to further testing. This motion was filed on November 14, 1990.

Respondent filed an opposition to Bar Counsel's motion for additional medical testing. As a result of this litigation, the hearing originally scheduled for December 5, 1990, was postponed. The litigation that ensued prevented the hearing from being concluded for more than three years. On January 15, 1991, the Board granted Bar Counsel's motion for authority to file a petition with the court seeking an order directing Respondent to submit to further neuropsychiatric testing. The petition was filed with the court on January 30, 1991.

Bar Counsel's exhibit list filed in November included among its exhibits the progress notes of Susann Makepeace, the Director of the Lawyer Counseling Program for the District of Columbia Bar, as well as a letter that Ms. Makepeace had written to the Chair of the Board. These documents suggested that Respondent was continuing to have problems with alcoholism. He had not been successful

---

**2.** "Tr. I" refers to the 1990–91 proceedings be-

fore the Hearing Committee on remand.

with treatment, and Ms. Makepeace believed that his prognosis was poor.

On February 11, 1991, the matter came before Hearing Committee Number Four. A preliminary issue that arose before any testimony was taken was whether Ms. Makepeace should be permitted to testify. Although Respondent had himself initiated in an earlier phase of the proceeding an effort to call Ms. Makepeace as a witness, he now opposed her testimony. He relied on a federal statute, 42 U.S.C. § 290dd–3, which protects the privacy of the records of an alcohol counseling program and of discussions between the patient and his counselor. Respondent had, on the advice of newly-appointed counsel, revoked his consent to the disclosure of these records and to Ms. Makepeace's testimony. He also argued that his consent applied only to the past disciplinary proceedings and not to the present disability hearing. (Tr. I at 18–20.) Bar Counsel argued that Respondent had consented and that the disciplinary proceedings and the disability proceeding had been consolidated by the Court of Appeals. Any privacy interest of Respondent had been waived. (Tr. I at 20–23.)

Present at the hearing was Katherine Mazzaferri, the Executive Director of the D.C. Bar. She requested on behalf of the President of the Bar that Ms. Makepeace not be compelled to testify until the counsel to the Bar had had a chance to consider the issue or until there was a court order. (Tr. I at 26–27.) Bar Counsel consented to the release of Ms. Makepeace as a witness until the lawyer for the Bar had had a chance to study the issue, but indicated his intention to cross-examine Respondent with Ms. Makepeace's notes. The Hearing Committee excluded that evidence without prejudice until the issue of Ms. Makepeace's testimony was resolved. (Tr. I at 30.)

The hearing then proceeded. Despite his opposition to further neuropsychiatric testing—an issue that was then pending before the court—in his opening statement, Respondent's counsel argued that Bar Counsel's evidence would not be as current as Respondent's evidence. (Tr. I at 35–36.)

On February 11, 1991, Hearing Committee Number Four heard the testimony of Dr. Arthur J. Pallotta. He had met Respondent through an Alcoholics Anonymous ("AA") program in 1986. He testified about a telephone call on October 23, 1987, from Respondent, who was then under the influence of alcohol but who denied that he had been drinking. (Tr. I at 42–43.)

Dr. Pallotta had originally supported Respondent at his first hearing, but he said in February 1991 that Respondent had failed to stop drinking. (Tr. I at 45.) He testified that he received phone calls from Respondent about once a month. More often than not, Respondent was under the influence of alcohol. (Tr. I at 46.) In the phone calls, Respondent did not volunteer that he had been drinking. Nor did he say that he was drinking while he was doing legal work. (Tr. I at 49.) Dr. Pallotta concluded that Respondent was drinking at the time of the phone calls because he had disorganized thoughts, slurred speech, and he rambled and repeated himself. (Tr. I at 50.) Dr. Pallotta always confronted Respondent about his drinking, and Respondent always denied that he had been drinking. (Tr. I at 51.)

Respondent also testified before Hearing Committee Number Four on February 11, 1991. He had been evicted from his last residence. (Tr. I at 54–55.) He testified that he had had his last drink more than three months prior to the hearing. (Tr. I at 58.) Over the year prior to the hearing, he said that he did not drink a great deal except for a brief period following a personal tragedy. On several occasions he drank heavily on the weekend. He was attending AA during this time. (Tr. I at 63.) He stopped drinking in part because a woman with whom he was living died, apparently from alcoholism, in December 1989. (Tr. I at 106.) He also was involved in some cases as a defendant and needed to stay alert. (Tr. I at 67–68.)

In 1983, at the Virginia proceedings, Respondent had stated his intention of remaining alcohol-free. He testified that he had not been successful. (Tr. I at 68–69.) Following his suspension in Virginia, he transferred his practice to the District of Columbia. (Tr. I

at 69.) It was not until April 1985 that he reported his suspension in Virginia to the District of Columbia. (Tr. I at 69.) At that time, he told Bar Counsel he intended to enter a recovery program. (Tr. I at 69.) · He·· stopped drinking for a period but resumed drinking while the proceedings were pending. (Tr. I at 69–70.) He admitted that he had not come to grips with what he wanted to do for himself. (Tr. I at 70–71.) He started drinking again in February or March 1986, after one of the hearings. (Tr. I at 73.) In the summer of 1986, he entered an inpatient detoxification program in Kansas. (Tr. I at 73–74.)

When the Assistant Bar Counsel started to inquire concerning Respondent's entry into the Lawyer Counseling Program, the Hearing Committee ruled against the admission of the evidence, without prejudice to reviewing the legal issue. (Tr. I at 77.)

Respondent testified that he entered Oxford House, a recovery house started by an AA sponsor in March or April 1988. He left because he could not afford to pay the fee. He denied that he was drinking while he was at Oxford House. (Tr. I at 77–79.) He admitted that he was drinking one night when he talked to Dr. Pallotta, but he denied calling him once a month. (Tr. I at 80.) He claimed that Dr. Pallotta's testimony that he (Respondent) was frequently intoxicated was a figment of his imagination. (Tr. I at 81.)

He admitted resuming drinking after he left Oxford House in the spring of 1988. (Tr. I at 81.) At the time he was in Oxford House, he had a small legal practice. (Tr. I at 82.) He had only simple cases, including a couple of traffic cases, writing a contract, and a divorce. (Tr. I at 83–84.) He was unable to think of any recent cases he might have litigated. He said he was preparing to file one case in United States District Court. (Tr. I at 85–86.)

He was drinking heavily the August and September prior to the hearing and was drinking into November, although not heavily. (Tr. I at 92.) He became sober just a few days before the pre-hearing conference of November 13, 1990, and, as of February

1991, had not had a drink since. (Tr. I at 93–94.) No client had complained about his legal work since July 1990. (Tr. I at 98.) He said he never has had any complaints about the competence of his work in the District of Columbia. (Tr. I at 107–08.)

At the time of his testimony, it was his intention never to drink again. (Tr. I at 116.)

Peter Tague, a Georgetown Law Professor, also testified. (Tr. I at 128.) Because Respondent had not represented any defendants in any criminal matters in the last several years and had no files to share, Professor Tague decided to give him assignments to simulate the work of a lawyer representing a criminal defendant. (Tr. I at 133–34.) Based on these assignments, Respondent appeared capable of practicing law. (Tr. I at 135–36.) He identified issues, fashioned a strategy, consulted with a client, and devised a tactical plan to achieve the ends that he sought. He was weakest in analyzing legal issues. (Tr. I at 136.) Professor Tague did not ask Respondent to perform any written work. (Tr. I at 138–39.)

Professor Tague was shown the witness list prepared by Respondent *pro se* after the November pre-hearing conference. He said that he did have concerns about the quality of the work. It was difficult to interpret; it was done sloppily; there were misspellings; and the punctuation was bad. The list of the exhibits seemed to be clear and to have been better written. (Tr. I at 141–42.) Based on some of the documents that Respondent wrote in connection with these proceedings, Professor Tague would have wanted to ask him some questions. The documents were not artfully drafted. (Tr. I at 158–59.)

The testimony of Dr. Michael Stoil was not presented because Bar Counsel and the Respondent stipulated that, generally speaking, the fact that someone is an alcoholic does not necessarily mean he lacks the capacity to practice law. (Tr. I at 162.)

The Hearing Committee also heard the testimony of Dr. Adele West, a psychiatrist who works with alcoholics. (Tr. I at 166–67.) She performed a psychiatric assessment examination of Respondent. Her opinion was

that Respondent had normal mental capacity. (Tr. I at 170.) There was no evidence of memory impairment. (Tr. I at 171.) There was no evidence of expressive motor aphasia, difficulty in producing speech, or of expressive sensory aphasia, difficulty in comprehending speech. (Tr. I at 172.) His memory was completely normal, and memory is the place where alcohol brain damage causes the most gross impairment. (Tr. I at 173.) He was able to concentrate and his general fund of knowledge was adequate. His vocabulary was good. (Tr. I at 174.) Dr. West concluded that Respondent had a serious desire to recover from his alcohol problem. (Tr. I at 176.)

The hearing was adjourned subject to the court's ruling on the motion for additional neuropsychiatric examination. (Tr. I at 209.) The parties also set a briefing schedule for the Makepeace issue. (Tr. I at 209–10.)

### 6. *Interlocutory Litigation of Evidentiary Issues*

On March 11, 1991, the District of Columbia Bar filed with the Board a motion to quash the subpoena commanding Ms. Makepeace to appear and testify before a hearing committee of the Board. The Bar argued that, because of the federal statute, the materials could not be disclosed absent consent of the patient, which had been withdrawn, or absent a court order. The Bar also argued that Bar Counsel could not make further use of the previously disclosed materials in any hearings. Respondent filed a brief advancing similar arguments. On April 4, 1991, the Hearing Committee ruled that it did not have the authority to compel Ms. Makepeace's testimony or permit use of her records without a court order. The Committee directed Bar Counsel to advise within 14 days whether it wished to proceed without the Makepeace testimony or documents or whether it would petition the court for an order. On April 17, 1991, Bar Counsel informed the Hearing Committee by letter to its chair that it would

seek a court order compelling the testimony of Ms. Makepeace and the use of her interview notes. Bar Counsel applied for such an order on April 29, 1991. Respondent opposed Bar Counsel's application. Briefing was completed on this issue before the court on May 20, 1991.

By order dated September 19, 1991, the court directed the Board and Counsel for the D.C. Bar to file briefs addressing the issues raised in the application to compel Ms. Makepeace's testimony. In its brief, filed on October 18, 1991, the Board took the position that the court should not consider ordering Ms. Makepeace to testify until the Hearing Committee proceedings were concluded. The Bar argued that Bar Counsel had not demonstrated good cause for disclosure of the materials and for Ms. Makepeace's testimony. Finally, on September 16, 1992, the court issued an order essentially adopting the position of the Board that the application of Bar Counsel was premature and, therefore, denied at that time.[3] It took almost 19 months for this issue to be litigated.

Meanwhile, another issue was wending its way through the Court of Appeals. On August 20, 1991, the court issued an order requiring the Respondent to appear for a neuropsychiatric examination by Dr. Bruce Becker. This order was amended on September 11. Thereafter, Respondent petitioned the court for rehearing *en banc*. By November 27, 1991, the court had not acted on the petition. Bar Counsel arranged for the test to be performed on that day. Respondent did not appear, however. Bar Counsel then wrote to the Executive Attorney of the Board and requested that the Board direct Respondent to appear for examination on December 18. In response to Bar Counsel's request, Respondent's lawyer wrote to the Executive Attorney stating his position that Respondent could not be required to appear until the court ruled on his petition for rehearing.

The Board ordered Respondent to appear for the December 18 examination in part

---

**3.** It is not clear with hindsight whether the Board did the court and the disciplinary system a service by making this recommendation. Our recommendation may have saved the court from having to decide a thorny legal issue, but it also deprived the decision-makers of what may have been highly relevant evidence.

because no stay had been entered with respect to the court's September 11, 1991 order. Respondent then asked the Board to stay its order while he sought a stay from the court. The Board denied the request for a stay on December 17, 1991. On February 4, 1992, the court denied the petition for rehearing *en banc,* without a single judge calling for a vote on the petition. For reasons that are not clear in the record, Respondent did not appear for his examination on December 18. Bar Counsel informed the Executive Attorney by letter dated March 4, 1992, that Respondent had failed to appear for an examination on February 29, because he was ill. The examination was rescheduled for March 28, 1992. He was apparently eventually tested on April 11, and on April 15, 1992, Dr. Becker issued his report. Thus the proceedings were delayed for 14 months in order to obtain this updated report.

### 7. The Motion to Dismiss the Disability Proceedings

The issue of further psychiatric examination was concluded with the examination in April 1992. The issue concerning the Makepeace testimony was concluded in September 1992. The next event seems to have been a status conference held on March 11, 1993, over two years after the previous hearing. At this conference, Bar Counsel proposed that the best resolution of this lengthy proceeding was to accept the Board's recommendation in the second disciplinary proceeding, *i.e.,* a thirty-day suspension. Bar Counsel would agree to withdraw its petition relating to disability. Bar Counsel and the Respondent agreed not to schedule any hearings in order to put this proposed resolution to the Board.

On March 29, 1993, Bar Counsel filed a motion to dismiss the disability proceeding and to resubmit the recommendations of the hearing committees in the original actions. This would have had the effect of resolving

the matter with a thirty-day suspension. In its pleading, the Office of Bar Counsel said that it had no evidence that Respondent was currently representing any clients. It also referred, however, to an arrest of the Respondent for public drunkenness on July 9, 1992. Respondent agreed with Bar Counsel's recommendation, although he denied that he was under the influence of alcohol in the July incident. However, the Board, concerned by the evidence of alcoholism, and faced with a court order that specific issues be litigated on remand, rejected this resolution. It ordered that the proceedings be resumed in accordance with the court's order. The Board's order was entered on July 27, 1993.[4]

### 8. The Proceedings on Remand Redux

On August 20, 1993, a pre-hearing conference was held. In December, Bar Counsel submitted its list of exhibits. Included was an arrest record of Respondent for drunkenness by the Arlington County Police on July 9, 1992. On December 2, 1993, there was another pre-hearing conference.

On January 12 and 13, 1994, testimony was heard by Hearing Committee Number Four, composed of Albert Turkus, Chair, Dr. Joseph Brent, and Katherine Gruenheck. Ms. Gruenheck was absent because of illness. Bar Counsel and Respondent consented to her participation through review of the transcript. (Tr. II at 3–5, 82.)[5]

The Office of Bar Counsel proffered that it still believed Ms. Makepeace was an important witness, although less important since her information was then four years old. (Tr. at 11–15.)

Dr. Bruce Becker, a neuropsychologist, had tested Respondent on two occasions, first in April 1987, and later in April 1992. (Tr. II at 49, 41.) Respondent's verbal I.Q., which Dr. Becker regarded as most important, was 115, or above average. (Tr. II at 49.) It was, however, probably below the level of

---

4. The wisdom of the Board's decision is open to question in light of subsequent events. Since we today recommend the same result that Bar Counsel advocated in 1993, we may well have done nothing in our order other than delay resolution for more than two years.

5. "Tr. II" refers to the transcripts of the 1994 proceedings before the Hearing Committee on Remand.

many practicing lawyers. (Tr. II at 50.) Respondent had a "very low" score, 83, on the performance side of the test. (Tr. II at 52.) Dr. Becker did not find evidence of functions so seriously compromised that Respondent could not practice law. Respondent probably did as well on the tests that related most closely to the practice of law as most practicing lawyers could do. (Tr. II at 54.) There was, however, evidence of compromised brain function. (Tr. II at 54.)

In Dr. Becker's opinion, Respondent could carry on routine functions in practicing law if they were familiar to him, but would have difficulty with complex legal concepts and courtroom confrontations. (Tr. II at 55.) Respondent's scores in 1992 were almost the same as in 1987. (Tr. II at 58–59.) He scored the same on verbal and overall performance I.Q., but worse on memory and immediate recall. (Tr. II at 59.) The test results confirmed Dr. Becker's earlier opinion that there was organic brain dysfunction as a result of alcohol. (Tr. II at 61–62.) Dr. Becker agreed that a job skills test is the best predictor of the ability of the person being tested. (Tr. II at 64.) His results were consistent with those of Professor Tague, although he was surprised that Respondent did as well as he did on Professor Tague's problems. Dr. Becker's tests could not be used to verify abstinence during the five-year period. (Tr. II at 72.)

Dr. Richard Ratner, a psychiatrist, also evaluated Respondent. He interviewed him on three occasions for a little over four hours. (Tr. II at 23–24.) In his December 23, 1993, evaluation, he quoted Respondent as saying that his last drink was in the summer of 1992. This was after he had testified in February 1991 in these same remand hearings, that it was his intention never to drink again. His examination was generally positive. There were some deficiencies which suggested organic brain disease secondary to the long-term effects of alcohol. He concluded that Respondent was an alcoholic but was not currently drinking. Although there was some deterioration in his mental state, it was not so severe as to prevent him from practicing. Dr. Ratner relied on Professor Tague's

report as demonstrating that he should be capable of practice. While Respondent's ability to handle novel matters was limited, he concluded that Respondent was fit to practice law. (Tr. I at 55.)

In 1991 Professor Tague gave Respondent two hypothetical problems involving criminal defendants. (Tr. II at 195.) In 1993 he used a civil problem. (Tr. II at 196.) He concluded that Respondent had the capacity to practice law. (Tr. II at 198.) He based his conclusion on the standards of competence arising out of the law of malpractice and ineffective assistance of counsel. (Tr. II at 198–99.)

Respondent testified that he had represented clients as recently as a month or six weeks prior to the January 12, 1994, hearing. (Tr. II at 89–90.) He further testified that he was currently incorporating a business. (Tr. II at 90.) He did not appear to have entered any appearances in court in the year prior to his testimony. (Tr. II at 91.) He had assisted another lawyer in a case, but did not try it himself. (Tr. II at 93.) He had filed a tax return for 1992 in which he declared income from the practice of law, but could not estimate how much. (Tr. II at 95–96.) In 1993 Respondent did not participate as attorney of record in any court proceedings.

Respondent denied that he was drunk when he was arrested in July 1992. He said that he had fallen asleep because he had been up all night when he was locked out of his apartment. (Tr. II at 99–101.) He had had nothing to drink. (Tr. II at 102.) He was sober from July 1990 until July 1992 and believed his last drink was around July 4, 1992. (Tr. II at 103–04.) He admitted to drinking about 18 months prior to the hearing, when he was having stress as a result of his rent situation. (Tr. II at 107–08.) He had not been in inpatient treatment. (Tr. II at 113.) He participated in AA and has helped others with alcohol problems. (Tr. at 114–19.) He admitted having returned to drinking after he had testified that he did not intend to do so. He said he had not had anything to drink for 18 months, and had developed a more positive attitude. (Tr. II at 122–23.) He went to three to five AA

meetings a week and had some contact with someone in the program every day. (Tr. II at 140.)

At the time of the 1994 hearing, he was employed by a consulting publishing firm. (Tr. II at 129.) He had begun his job with Information Resources, Inc., in late October 1993. (Tr. II at 130–31.) He worked as an employee in the Bush campaign from August until November 1992 and then did *ad hoc* work until October 1993. (Tr. II at 135–36.) Some of this work was for lawyers, but he could not remember their names. (Tr. II at 137.)

He recognized that his skills had slipped, and if he returns to practice, he would like to have the benefit of working with people who have been regularly practicing. (Tr. II at 140–42.) He has never been a defendant in a malpractice action, and no judge has ever found him to be incompetent. (Tr. II at 143–44.) He represented a company called Watson and Hughey until they reorganized in the fall of 1991. (Tr. II at 148–49.) He also represented a number of charities. (Tr. II at 149.) Since the Watson and Hughey representation, his practice has been limited. (Tr. II at 149.)

He has not been formally prevented from practicing law by any of these proceedings in the District of Columbia but rather has chosen not to practice actively. (Tr. II at 182.)

The Hearing Committee submitted its findings to the Board. It found no disability, and recommended that the disciplinary matters be resubmitted to the court for action on the Board's prior reports and recommendations. The Board heard oral arguments on July 27, 1995.

### FINDINGS

1. *Disability*

Based on the findings of the Hearing Committee, we do not find a disability suspension to be appropriate. The Hearing Committee found no disability. "The testimony of Professor Tague and that of Drs. Becker and Ratner suggest that Respondent is currently fit to practice law. Moreover, there was no evidence offered to the contrary." (Report at 23.) The Hearing Committee found "considerable evidence of Respondent's recovery, and no evidence of any recent periods of drinking." (Report at 23.) In the words of the Committee,

> The evidence offered indicates that Respondent is a recovering alcoholic, who, at the time of the proceeding, had achieved substantial recovery. Given his history, the testimony suggests that there is always a potential for a relapse; however, the testimony of Dr. Ratner, which was not disputed by any contrary testimony, indicated that Respondent was substantially recovered and that the prognosis was quite good for the future. Moreover, Respondent's own testimony, while not totally unequivocal, seemed to indicate a resolve to continue with his recovery and a recognition of the relationship between his drinking and his ability to practice. (Report at 24.)

Bar Counsel does not challenge the Hearing Committee's conclusion that a disability suspension is not appropriate.[6]

At oral argument, Respondent requested that in addition to issuing its report and recommendation, the Board treat several issues which he believes emerge from this consolidated case. One of his requests was that the Board adopt a rule setting a higher standard which must be met before Bar Counsel can bring a disability proceeding. We reject the suggestion that Bar Counsel did not have cause in Respondent's case to bring a disability proceeding. In the original incapacity proceeding brought by Bar Counsel in 1987, the Hearing Committee and the Board expressly found that Respondent was suffering from alcoholism. (Board Report III at 5.) The committee also found that Respondent's alcoholism had impaired his

---

6. If the Board had found a causal connection between Respondent's misconduct and alcoholism and had not found evidence of rehabilitation, in addition to a 30-day suspension, it might have recommended a requirement that the Respondent show his fitness to practice law in order to be reinstated. Respondent suggests that such discipline would violate the Americans With Disabilities Act. As we do not recommend a suspension based on incapacity, we need not reach this issue.

 

neuropsychological functioning and that Respondent had serious difficulty with problem-solving tasks. *Id.* Further, Respondent had admitted in the Virginia proceedings that his alcoholism had caused his misconduct. *Id.* Respondent also stated, in his answer to the charges in the first disciplinary proceedings, that he intended to offer evidence of his disease, addiction to alcohol, and its effect on him, including its causative relationship to his problems. *In re S.,* 579 A.2d 156, 158 (D.C. 1990). The Board recommended suspension for an indefinite period until Respondent showed fitness to practice law. (Board Report III at 14.) The court did not follow this recommendation because the Board incorrectly insisted on separating the disability and disciplinary issues. *Id.* at 160. Nevertheless, the extensive evidence of alcoholism in the record clearly supports Bar Counsel's decision to bring a disability proceeding against Respondent. While the Board recognizes the strain which these proceedings have had on Respondent, no proper standard would have prevented Bar Counsel from bringing an incapacity proceeding in these circumstances. Not only is this not the appropriate forum for rule-making, but the history of this proceeding does nothing to support the need for a tougher standard for bringing incapacity proceedings as Respondent requests. There was no abuse here.

Respondent further requests the Board to define "capacity to practice law" in order that there be a controlling standard for incapacity proceedings. Respondent points to the difficulty of showing capacity without an articulated standard and without guidance as to what proof is required. Capacity must be judged by weighing the effect of a respondent's disability on the type of law practice that he or she has. The law is replete with terms which require factual determinations that do not lend themselves to precise definition. The issue of capacity varies with the facts of a particular respondent's situation. We do not believe that a more precise definition is possible or advisable. Nor do we believe that Respondent's case teaches that such a definition is required. The procedural twists and inordinate delay that characterize

this case have nothing to do with an inability to define more precisely the term "capacity to practice law."

Third, Respondent requests that the Board establish a time limit for disability proceedings. As discussed more fully below, the delay in this particular case is attributed in part to Respondent himself, in part to the process, but not to Bar Counsel. While such delay is regrettable, the District of Columbia disciplinary system was faced in these proceedings with a new issue. The Hearing Committee and the Board both believed that fitness to practice law was separate from the disability issue and could not be considered in a disciplinary proceeding unless raised in mitigation by Respondent. These rulings were wrong, but the issue was novel. Moreover, it was Respondent who urged this erroneous position. This issue has not been resolved by the court in a manner likely to prevent such delay from occurring in future proceedings.

### 2. *Sanction*

Hearing Committee Number Ten found that Respondent violated DR 9–103(B)(3) (failure to "[m]aintain complete records of all funds ... coming into the possession of the lawyer") and DR 9–103(B)(4) (failure "[p]romptly [to] pay ... to the client ... funds ... which the client is entitled to receive"). For these violations, the Board recommended a sanction of public censure. Hearing Committee Number Seven found that Respondent violated DR 9–103(B)(4) (failure "[p]romptly ... [to] deliver to the client as requested by the client the ... properties in the possession of the lawyer which the client is entitled to receive") and DR 3–101(B) (practicing law under suspension "in violation of regulations of the profession" in the District of Columbia). For these violations, the Board recommended that Respondent be suspended for thirty days. As the Board finds no current disability, the indefinite suspension recommended in the disability proceeding is not appropriate. We adopt Hearing Committee Number Ten's recommendation of a thirty-day suspension.

*In re Goldstein,* 471 A.2d 267 (D.C.1984), involved a public censure for violation of DR

6–101(A)(3), neglecting a client matter, and DR 9–103(B)(4), failing to make prompt payment of funds from an escrow account. The respondent's neglect had not resulted in any injury to the client, and he failed to pay the funds promptly because he believed he had a right to set off fees owed to him in another matter. The respondent had no prior disciplinary record.

*In re Washington,* 489 A.2d 452 (D.C. 1985), involved a three-month suspension for violations of DRs 1–102(A)(5), 3–101(B), and 6–101(A)(3). The respondent had practiced law in a jurisdiction where he had no license and had neglected a legal matter entrusted to him. In another matter, he had neglected a legal matter entrusted to him and had engaged in conduct prejudicial to the administration of justice. Considered in mitigation were the respondent's record of *pro bono* service and the absence of any prior discipline.

Respondent's misconduct was not as serious as that in *Washington.* However, Respondent similarly engaged in misconduct on two separate occasions. His misconduct is more serious than in *Goldstein.* While Respondent also has not been subject to prior discipline, he has offered no *pro bono* service record to be considered in mitigation.

Respondent asserts that there should be no sanction because the only purpose of discipline in his case would be punishment. He bases this argument on the fact that the Hearing Committee found him capable of practice and found that he had engaged in little actual law practice. However, capacity is not a basis for mitigation. Lack of capacity may prevent an attorney from practicing, but there is no basis for avoiding all discipline because of capacity to practice. Also, Respondent's choice not to practice is not a mitigating factor. While Respondent may not have been a potential source of harm to the public recently, it is not clear that the pendency of these proceedings has not had a deterrent effect.

Respondent further argues that the rationale behind the thirty-day suspension is no longer applicable because the two disciplin-ary violations "can now only be viewed as isolated incidents" in Respondent's legal career. (Respondent's Brief at 6.) Respondent also asserts that the absence of disciplinary proceedings against him shows that no sanction need be imposed in order for his behavior to be corrected. Again, however, it is not clear that the pendency of these proceedings has not had a deterrent effect on Respondent. While many factors may be considered in mitigation, including the absence of prior disciplinary history, Respondent engaged in misconduct on two separate occasions. While his career may have otherwise been law-abiding, the two incidents occurred within a few years of each other, and since then Respondent has been, in the words of his counsel, "under heightened scrutiny" which may have encouraged ethical behavior. (Respondent's Brief at 6.) Further, general deterrence of others is also a legitimate purpose for discipline. *See Attorney Grievance Comm'n of Md. v. Protokowicz,* 329 Md. 252, 619 A.2d 100, 105 (1993) (concepts of general and specific deterrence are consistent with primary goal of discipline, which is to protect the public).

Respondent further argues that the delay which has occurred in these proceedings should be considered a mitigating factor. However, Respondent himself "contends that the delay is a direct result of the process itself." (Respondent's Brief at 7.) Disciplinary proceedings are lengthy, and three separate proceedings were brought and only eventually consolidated.

Respondent cites *In re Fowler* and other cases for the proposition that delay in prosecuting a disciplinary matter may be a mitigating factor. (Respondent's Brief at 7.) It is important to note, however, the court's emphasis on the extent to which delay is not attributable to the respondent. In quoting the Board's recommendation for mitigation due to delay, the court placed emphasis on the Board's statement that mitigation would be appropriate "where *none* of the lengthy delay is attributable to Respondent." *In re Fowler,* 642 A.2d 1327, 1328 (D.C.1994) (emphasis added). When Fowler filed requests for extensions of time and an action in federal court to prevent the District of Columbia

court from deciding the case, the court attributed the time taken by those actions to Fowler and disagreed with the Board's recommendation of a mitigated sanction. *Id.* at 1330.

Similarly, Respondent was responsible for much of the delay in these proceedings. Respondent neglected to inform the court in timely fashion of the discipline imposed by Virginia. While the Board initially erred by not considering the disability issues in the context of the disciplinary proceedings, it did so at Respondent's urging. Respondent objected to testimony by Ms. Makepeace and admission of her notes, though he had originally offered such evidence himself. Litigation of that issue accounts for more than a year and a half of the delay. Although Mr. McKay argues in his dissenting report that Respondent prevailed on this issue, he did not prevail on the merits. Rather, the court ruled that the issue was prematurely raised. It is accurate that Bar Counsel failed to call Ms. Makepeace or offer her records· when the hearing resumed. Ms. Makepeace refused to testify absent a court order which Bar Counsel had not obtained because the court ruled that the issue was premature. Bar Counsel stated on the record that he would still like to call Ms. Makepeace even thought her evidence had become dated with the passage of time. Respondent also refused to agree to any updated neuropsychiatric examination. This refusal sparked a year of litigation, and after the litigation was resolved, Respondent delayed submitting to an examination for several more months.

Further, the court in *Fowler* limited mitigation due to delay to "unique and compelling" circumstances: "[T]he circumstances of the individual case must be sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." *Fowler,* 642 A.2d at 1331. While the total length of all three proceedings is "unique," the delay which occurred is not compelling; it seems to have helped, not prejudiced Respondent's case. Respondent cites *In re Williams* as

authority for the possibility that delay could result in a due process violation. However, the court actually said that "delay *coupled with actual prejudice* could result in a due process violation." *In re Williams,* 513 A.2d 793 (D.C.1986) (emphasis added). Where Respondent's defense was not impaired, delay is not a proper ground for dismissal. *Id.* at 797. As Bar Counsel points out in his ·brief, Respondent suffered no actual prejudice as a result of the delay in these proceedings. The reality is that after the extensive delay, Respondent was able to produce evidence that convinced a hearing committee that he was not disabled. Initially, the hearing committee, and the Board, reached the opposite result. Moreover, during this entire period of delay, Respondent remained an active member of the bar, free to practice.

Finally, contrary to the suggestion by Mr. McKay, the Board is not penalizing Respondent for raising procedural issues that delayed the proceeding. Instead, it is refusing to give him the benefit of delay for which he was largely responsible. A respondent should not be permitted to delay proceedings by litigating every procedural issue and than rely on the delay for which he was responsible as a reason for mitigating the sanction.

### 3. *Confidentiality*

While we refer to Respondent as "S.", pursuant to the court's opinion, *In re S.,* 579 A.2d 156 (D.C.1990), we urge the court to reconsider the confidentiality determination and to make this matter public. The court concluded in *In re S.* that issues regarding Respondent's capacity to practice law should be consolidated with disciplinary violations in the same proceeding. At the time these matters were initiated, under Rule XI, Section 17(a), disciplinary proceedings became public at the time a hearing committee made a recommendation of discipline greater than an informal admonition. Thus, even under the old rule, the two disciplinary matters, resulting in hearing committee recommendations of public censure and suspension, would be public.[7] It is true that Section 17(b)

---

7. Under the current rule, in effect since January 1, 1995, all matters become public from the time

Bar Counsel files a petition.

provides for allegations of disability to be kept confidential until the court enters an order suspending the attorney. The rules therefore require that the disciplinary matters be public but that the disability proceeding be confidential. While we are not aware of any precedent on this issue, it seems that the public interest is better served by these matters being made public. Respondent's identity should not be protected just because there was evidence suggesting that he, in addition to violating several disciplinary rules, was not always capable of practicing law. Furthermore, we understand the court's ruling in *In re S.* to be that, in disciplinary cases, hearing committees should consider issues of disability if they may relate to the respondent's capacity to practice law, even if the Respondent does not raise the disability in mitigation. If that is so, it cannot be the court's intent to convert public discipline cases—which now are public as of the date of the petition—retroactively into secret cases. Indeed, as a practical matter that cannot occur, since the matter will be of public record in most instances before any issues of disability arise.

Most importantly, we believe the public interest is best served if Respondent is identified so that the consumers will be aware of his disciplinary history.

THEREFORE, the Board respectfully recommends that Respondent receive a suspension for thirty days.

Respectfully submitted,
/s/Hamilton P. Fox, III
Chair

Date: October 17, 1995

All members of the Board concur in this Report and Recommendation except Mr. McKay and Mr. Rezneck, who dissent.

## DISSENT OF JAMES C. McKAY AS TO RECOMMENDED SANCTION

In my view, the evidence of record establishes that a substantial portion of the delay in these proceedings was not attributable to inappropriate conduct of Respondent. Accordingly, I believe the inordinate lapse of time should be treated as a mitigating factor, and that the 30–day suspension recommended by the majority of the Board either should be suspended in its entirety or reduced to a public censure.

The first alleged misconduct by Respondent occurred in Virginia in 1981; the second occurred in 1984 and 1985. Following the hearing on the second matter, the Board, in the words of the majority, "took the first step down what was to prove a disastrous procedural course by agreeing with the Hearing Committee that Bar Counsel's challenge to Respondent's present fitness to practice law was not relevant to the charges of past violations of disciplinary rules." Respondent, of course, cannot be blamed for that erroneous decision. It would appear that much of the delay that followed stemmed from that "disastrous" procedural recommendation.

The majority faults Respondent for the thirty-three months it took to resolve the *Makepeace* and neuropsychiatric examination issues. However, neither the court nor the Board found Respondent's actions to be frivolous in nature. The fact is, he was acting within his rights and under the advice of counsel when he litigated those issues. Moreover, he prevailed in substance on the *Makepeace* issue. The court ruled that consideration of that issue was premature. And apparently no effort was made by Bar Counsel to offer Ms. Makepeace's records in evidence or call her as a witness during the resumed hearing. Presumably, her views were not thought to be needed in view of the extensive expert testimony presented by other witnesses, as well as by Respondent himself.

In any event, it would, in my opinion, establish a troublesome precedent to formulate a rule that would in effect penalize a respondent for raising issues, procedural or substantive, that delayed a disciplinary proceeding.

There were additional major delays which cannot be attributed to Respondent's inappropriate actions. Although the report of the neuropsychiatric examination was issued on April 15, 1992, a status conference was not held until nearly one year later, on March 11, 1993. Pre-hearing conferences were not held

until August 20, 1993, and December 2, 1993, and a hearing was finally held in early 1994.

The Board's concern about the delay stemming from the earlier procedural error was reflected in its July 27, 1993, order requiring that the report of the committee, to which the matter was remanded, be filed within 60 days after completion of the hearing.

The hearing was not completed until February of 1994. Although the report, in order to comply with the Board's order, should have been filed on April 25, 1994, it was not filed until more than one year later, on April 27, 1995. That filing came only after issuance of the Board's March 27, 1995, order (in response to Respondent's motion) which characterized the delay in the issuance of a hearing committee report as being "clearly excessive."

A finding that there should be a reduction in the sanction which otherwise would be appropriate, where there has been substantial delay not attributable to a respondent's inappropriate conduct, is supported by the decision of the District of Columbia Court of Appeals in *In re Fowler*, 642 A.2d 1327 (D.C. 1994).

The majority misconstrues the court's emphasis in *Fowler* on the Board's finding that none of the lengthy delay was attributable to Respondent (642 A.2d at 1328). The court emphasized that statement because it was completely contrary to the evidence. After reciting the pertinent evidence, the court concluded that the chronology of events "demonstrates without cavil that the 'delay' in this court" was "entirely chargeable to Fowler." (*Id.* at 1329) The court's emphasis on the Board's erroneous statement was not meant to suggest that a sanction may be mitigated only where *none* of the delay was caused by a respondent, but, as stated, to contrast the Board's erroneous finding with the evidence of record.

In rejecting the Board's recommendation in *Fowler*, the court referred to several cases in which the Board has used time delay, not the fault of the respondent, as a basis for reducing the sanction which otherwise would have been appropriate. These included *In re Hessler*, 549 A.2d 700 (D.C.1988), *In re Miller*, 553 A.2d 201 (D.C.1989), and *In re Schneider*, 553 A.2d 206 (D.C.1989).

In *Hessler*, a one and one-half year delay before Bar Counsel initiated formal disciplinary proceedings, as well as expiration of an additional eight months before the Hearing Committee's report, was found to be a mitigating factor. (549 A.2d at 716).

In *Miller* the court, in reducing the Board's recommended sanction from a one year suspension to a suspension of 30 days, pointed out, among other things that six years had elapsed "since respondent's conduct at issue here. In those six years, respondent has practiced law without incident." (553 A.2d at 206). Continuing, the court said:

As the Board concedes, this fact "gives some confidence that [respondent] is more sensitive to her ethical obligations and is not likely to repeat her misconduct." (*Id.*)

Similarly, in *Schneider*, the Court of Appeals reduced the Board's recommended sanction from six months to thirty days. Among the "significant mitigating factors" leading to the reduction of sanction was the fact that the "disciplinary process has dragged on into its sixth year, a delay to which we ourselves have contributed." (553 A.2d at 212).

The court in *Fowler, supra,* did not "venture to opine under what circumstances time delay may properly mitigate an otherwise appropriate sanction." However, it went on to say:

[W]e do express the view that the circumstances of the individual case must be sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest. (*Id.* at 1331)

Respondent's misconduct occurred in 1981, 1984, and 1985. There has been no evidence that Respondent has engaged in any subsequent unethical misconduct. That he may not have been in active practice and/or may have been under "heightened scrutiny" certainly should not be viewed as negative factors. And speculation that the "pendency of these proceedings" may have deterred Re-

spondent from engaging in unethical conduct surely can be no justifiable basis for not mitigating the sanction.

The majority implies that a respondent must demonstrate actual prejudice to support an argument that delay should result in a mitigation of the sanction which otherwise would appropriately be imposed, citing *In re Williams,* 513 A.2d 793 (D.C.1986). In *Williams* there was an affirmative finding of no prejudice by the hearing committee, which was not disturbed by the Board or the court. Here, the issue of prejudice was not directly litigated, although it would seem obvious that an attorney would be prejudiced by having disciplinary proceedings hanging over his head for more than a decade.

In *Williams* the court decided *"only* that *dismissal* for no reason other than a delay in prosecution is inappropriate when allegations of attorney misconduct remain unresolved." (513 A.2d at 798) (emphasis added). Here, unlike the situation in *Williams,* dismissal is not being recommended in this dissent. If the sanction were mitigated as suggested, the case would be a precedent for the imposition of a 30-day suspension in future proceedings. It also would be a precedent for mitigating a sanction in circumstances where there has been substantial delay in the proceedings not caused by the respondent's inappropriate conduct.

It is worthwhile repeating the court's admonition laid down in *Williams:*

> Tardy prosecution of potential offenders does a disservice to the attorney, to the affected clients, to the courts, and to society in general. An undue delay in prosecuting charges casts an unjustified shadow over an innocent attorney; it allows a guilty one to practice with impunity; it dims memories and so distorts the truth-finding process; it threatens to put the integrity of the courts at the mercy of the unethical practitioner; it does nothing to deter other members of the bar from misconduct; and it erodes public confidence in the bar's announced intention to keep its house in order. (*Id.* at 798)

As noted heretofore, I disagree with the majority that Respondent was "largely responsible" for delaying the proceedings. I believe the circumstances of this case are sufficiently unique and compelling to justify mitigating the sanction imposed herein. The circumstances certainly are as compelling as those present in the *Hessler, Miller,* and *Schneider* cases, *supra.*

In my view, the public interest would be adequately protected if the otherwise appropriate sanction of a 30-day suspension were reduced, either by suspending the entire period, or by a public censure issued by the District of Columbia Court of Appeals. *See Fowler, supra.*

Respectfully submitted,

/s/ James C. McKay

Daniel A. Rezneck joins in this dissent.

October 18, 1995